## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**STACY N. FRANK**,

      Plaintiff,

v.                           Case No. 8:23-cv-2596-WFJ-AAS

**THE BUILDING INDUSTRY
CONSULTING SERVICE
INTERNATIONAL, INC.**,

      Defendant.

_____/

## <u>ORDER</u>

Plaintiff sues Defendant (or "BICSI") for gender harassment and discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and gender harassment and discrimination in violation of the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* Now before the Court in this employment action is Defendant's motion for summary judgment. Dkt. 70. Plaintiff has responded, Defendant has replied, and Plaintiff has sur-replied. Dkts. 77, 91, 97. For the reasons explained below, Defendant's motion is due to be granted.

## BACKGROUND

This case centers around the personality conflict between Plaintiff Stacy Frank and her supervisor, Fiorella Landeo. Plaintiff worked as a graphic designer and then senior graphic designer in BICSI's marketing department since 2015. Dkts.

69 ¶ 4; 78 ¶ 7. In September 2022, BICSI hired Ms. Landeo as the marketing department manager. Dkt. 69 ¶ 11. BICSI terminated Plaintiff's employment in May 2023. Dkt. 78 ¶ 27.

Plaintiff claims that BICSI discriminated against her based on her sex and gender nonconformity. *See generally* Dkt. 1. Plaintiff describes herself as "often mistaken for a male." Dkt. 78 ¶ 53. She is a lesbian who "has short hair, does not wear makeup, does not wear traditional female attire . . . , has a deep, gravelly voice, is outspoken, and on occasion uses profanity." *Id.* Conversely, Plaintiff portrays Ms. Landeo as a woman with traditional values. *See* Dkts. 77 at 15; 79-5 ¶ 10.

The parties cite to discrete incidents to illustrate what they believe to be either legitimate reasons for termination or evidence of discriminatory animus. The Court will discuss the incidents below.

### Cursing During the All-Staff Meeting

BICSI CEO John Daniels testified to this event as the beginning of the end—"things seemed to, I guess, devolve from there." Dkt. 80-4 tr. 135:7–136:4. In November 2022, BICSI held an online, all-staff meeting discussing changes to benefits. Dkt. 63-1 tr. 53:8–57:7. As a speaker explained the new health insurance, Plaintiff, unmuted, stated, "And I have no clue what the f*** is going on. It's b***s***." *Id.* tr. 55:16–17.

2

Plaintiff maintains this was an accident that others laughed off or ignored, while BICSI highlights the impropriety of the comment. Dkts. 69 ¶ 14; 78 ¶ 14. In response, Ms. Landeo and Gail Moore Swaby, Ms. Landeo's supervisor, counseled Plaintiff. Dkts. 69 ¶ 16; 78 ¶ 14. Ms. Swaby encouraged Plaintiff to be more mindful of how she speaks. Dkt. 80-3 tr. 119:24–120:10. Ms. Landeo advised Plaintiff to apologize to Bernard Currie, director of HR, and suggested Plaintiff blame the comment on talking to her cats. Dkt. 63-1 tr. 94:1–22. These conversations were not considered formal discipline. Dkt. 80-3 tr. 120:11–13. BICSI's corporate representative testified that this incident did not contribute to the termination decision. Dkt. 80-6 tr. 107:17–22.

*The Roommate Comment*

Plaintiff interestingly only makes a passing citation to this incident in her response, although it seems to be her most salient point. At the beginning of March 2023, Ms. Landeo went to Plaintiff's home to attempt to help with a computer problem. Dkt. 63-1 tr. 123:6–19. Ms. Landeo saw there that Plaintiff lived with her same-sex partner. Dkt. 84-13 at 6. At a later date, Plaintiff brought cupcakes to work, which Ms. Landeo distributed to employees. *Id.* One employee inquired where the cupcakes came from, to which Ms. Landeo replied something to the effect of, "you know that person [Plaintiff] lives with," *id.* at 7, or "[Plaintiff's] roommate." Dkt. 79-5 ¶ 10.

3

*Complaints About Ms. Landeo*

Plaintiff and two of her coworkers, Amanda Lamadrid and Ansley Waddell, complained to HR about Ms. Landeo in February and March of 2023. Dkt. 78 ¶ 20. Ms. Waddell noted Ms. Landeo's propensity to speak poorly of her peers, especially those she no longer considered "loyal." Dkt. 84-8 at 1. She reported Ms. Landeo repeatedly asking personal questions on topics such as intimacy, religion, and health information. *Id.* Ms. Landeo also allegedly shared the personal health information of another employee with Ms. Waddell while picking up coffee. *Id.*

Ms. Lamadrid partook in this outing, and also included the disclosure in her report to HR, describing it as "part of a larger pattern of crossing boundaries and speaking about others within the company without their knowledge." Dkt. 84-11 at 3. Ms. Lamadrid explained other concerns she had with Ms. Landeo, noting her demands not to speak directly with Ms. Swaby or anyone outside the marketing department. *Id.* at 2. Ms. Landeo allegedly did not pay attention to meetings and correspondences that were her responsibility, and sometimes represented untruthful updates to BICSI officers. *Id.* at 2, 3. She often spoke poorly of Ms. Swaby and others who were not in the office, including Plaintiff and her "difficult personality." *Id.* at 3. She allegedly suggested Ms. Swaby showed favoritism based on race. *Id.* at 4. Finally, she forced uncomfortable conversations with Ms. Lamadrid and Ms. Waddell on topics such as birth control. *Id.*

4

Plaintiff's complaint to HR about Ms. Landeo echoed many of the same sentiments, expressing discomfort at Ms. Landeo's seemingly authoritarian operation of the marketing department and her treatment of Ms. Swaby. Dkt. 81-3 at 4. Plaintiff later clarified that her grievance was not simply about changes in the marketing department, but "more so about how [she], along with [her] peers, ha[d] been treated." *Id.* at 1. Plaintiff admits that she never complained about sexual orientation discrimination to HR. Dkt. 63-1 tr. 122:4–18. When asked at her deposition whether Plaintiff believed she was treated differently because of her gender nonconformity, she responded: "That would be the only reason I can think of." *Id.* tr. 159:17–24.

## *Events Designer Position*

In April 2023, BICSI placed Plaintiff's coworker Jamie Finne in a newly created position without affording other employees, including Plaintiff, the chance to apply. Dkt. 77 at 15. Plaintiff understood the position to handle many of the tasks Plaintiff already performed throughout her tenure, namely designing for events and conferences. Dkts. 77 at 15; 63-1 tr. 46:9–18. She testified that the new position would subsume "ninety percent" of her duties, and felt unsure of what would happen to her role. Dkt. 63-1 tr. 49:20–50:5. She also testified that she did not know whether the new position was a promotion or a "lateral" devoid of pay raise. *Id.* tr. 46:19–23. She explained her reaction as "not necessarily, why didn't I get this role? I wanted

to apply for this role. It was more there was no option and there was no communication, what was happening to my role . . . ." *Id.* tr. 50:2–5.

BICSI explained its practice of sometimes not posting a new job internally depending on the position. Dkt. 79-14 tr. 93:15–19. Especially if BICSI were promoting an employee, it might do so without an application process "based off of reviews . . . and the need of the organization." *Id.* tr. 93:20–94:16. CEO Mr. Daniels explained specifically as to the events designer position:

> I believe that was because Jamie's position—as part of the reorganization, I believe her position was being repurposed, and it was being repurposed to the event graphics specialist. And because it was being repurposed, it was reclassified from a pay grade perspective. And in this case, Jamie qualified to continue filling that role, if you will, and it resulted in a promotion for her.

Dkt. 80-4 tr. 119:15–23. Thus, because the marketing department "reorganize[d] the team to provide a more focused approach to each of the various product lines," but "still needed [a senior graphic designer]," Ms. Finne became the events designer while Plaintiff remained a senior graphic designer. *Id.* tr. 120:16–122:2.

*Nonparticipation in Candidate Interviews*

At the beginning of May 2023, BICSI conducted interviews to hire more graphic designers and/or marketing team members. Dkt. 69 ¶ 19. Ms. Landeo requested that her team ask questions of the candidates. Dkt. 80-1 tr. 140:9–12. All team members participated in the interviews except Plaintiff, who attended, but did not engage. *Id.* tr. 139:21–140:1; *id.* tr. 141:13–15.

Plaintiff does not dispute that she did not ask questions during interviews. Dkt. 63-1 tr. 144:15–18. She asserts that she preferred not to ask questions after Ms. Landeo previously disregarded her feedback on a candidate she felt was underqualified. Dkt. 78 ¶ 19. Plaintiff also emphasized that, despite her supervisor's request for participation, her duties as a graphic designer did not include interviewing job candidates. Dkt. 63-1 tr. 152:2–24.

*Withholding Information*

On May 11, 2023, the day before Plaintiff's termination, Ms. Landeo informed CEO Mr. Daniels that Plaintiff "withheld information from her on a particular project." Dkt. 80-4 tr. 130:14–18. (As an aside, Mr. Daniels had taken over Ms. Swaby's role as Ms. Landeo's supervisor. He now oversaw Ms. Landeo and the marketing department directly. Dkt. 78 ¶ 11.) For the project, Ms. Landeo created and sent "concepts" to Plaintiff to use as models for the artwork. Dkt. 63-1 tr. 96:9–21. Some of these concepts included the color red, which BICSI typically did not use in its designs. *Id.* tr. 97:4–21.

Plaintiff does not dispute that she never subsequently informed Ms. Landeo that BICSI does not use red. Dkt. 63-1 tr. 99:12–15. Per Plaintiff's testimony, Ms. Landeo had advised that she already met with others who approved the colors. *Id.* tr. 97:4–21. Plaintiff attempted to confirm that with the others, who denied that this meeting occurred. *Id.* tr. 100:9–14. So, Plaintiff described herself as "in a position

that [she] either [had] to call [Ms. Landeo] a liar or do what she sa[id] . . . because she's in charge of marketing." *Id.* tr. 100:9–14. Plaintiff thus opted not to tell Ms. Landeo that BICSI generally avoids red. *Id.* tr. 99:12–15.

*Termination*

When terminating Plaintiff's employment, BICSI's HR director told Plaintiff she was "violating the code of conduct." Dkt. 63-1 tr. 109:17–20. Plaintiff states she first discovered a more specific reason months later, when BICSI told "unemployment" it fired her for withholding branding information. Dkt. 78 ¶ 68.

In a memo dated the same day as Plaintiff's termination, but emailed to HR after Plaintiff was dismissed, Ms. Landeo documented more instances of Plaintiff's misconduct. Dkts. 81-12; 78 ¶ 69. She began with the instance of inappropriate language at the all-staff meeting, then noted Plaintiff's complaints about potentially having to return to the office post-COVID rather than work from home. Dkt. 81-12. Ms. Landeo also apparently had to take over a marketing project after Plaintiff commented that a leader was "a simple accountant." *Id.* Ms. Landeo noted Plaintiff's refusal to continue asking questions of job candidates and refusal to train new employees. *Id.* Further, Plaintiff had allegedly voiced frustration with BICSI officers and their "credibility" to do some of their job functions. *Id.* Lastly, Ms. Landeo cited Plaintiff's failure to inform her about BICSI's non-use of red artwork. *Id.*

CEO Mr. Daniels testified that he and Ms. Landeo consistently communicated about Plaintiff: "[O]ver the course of she and I working together, she would often come with questions, with asking for advice . . . . And I believe we've had conversations about all of those issues leading up to the day that [Plaintiff] was terminated." Dkt. 80-4 tr. 130:7–13. When Ms. Landeo reported Plaintiff's "withholding" of BICSI's non-use of red, this was "just another incident that had been reported to [him] with respect to [Plaintiff]." *Id.* tr. 135:4–6. He testified that "in [his] mind, at that point, when [he] made the decision to terminate her, it was in consideration of all of these things that have led up to that point that created—that had been disruptive and, in [his] opinion, insubordinate over a period of time." *Id.* tr. 135:24–136:4.

For her part, Plaintiff emphasizes that BICSI had never formally disciplined her for anything. Dkt. 78 ¶ 52. Before Ms. Landeo's arrival and reporting of Plaintiff's misconduct, Plaintiff's performance reviews were positive. *Id.* ¶ 51. They frequently noted Plaintiff's positivity, professionalism, and willingness to rise to the occasion when asked to complete last-minute or voluminous work. *Id.*

Finally, Plaintiff points to suspicious circumstances of her termination. She notes that BICSI terminated her with no warning, despite its progressive discipline policy. Dkt. 77 at 10. BICSI had utilized its progressive discipline policy with other

9

employees before, and seemingly terminated without notice only one other employee who came to work under the influence. Dkt. 78 ¶ 47.

Plaintiff also suggests that BICSI witnesses have conflicting testimony about who decided to terminate her, Dkt. 77 at 11, although the Court is not convinced the testimony is inconsistent. It appears that the day of Plaintiff's termination, Ms. Landeo first went to CEO Mr. Daniels to report Plaintiff's failure to disclose BICSI's non-use of red. Dkt. 80-4 tr. 131:24–132:17. Mr. Daniels testified that Ms. Landeo did not want Plaintiff disciplined or terminated; she was just informing him of another occurrence with Plaintiff. *Id.* tr. 134:9–16. Mr. Daniels decided at that point termination was warranted. *Id.* tr. 135:19–136:4. He testified that he "imagines that [he] would have mentioned [his conversation with Ms. Landeo] to our director of HR when [he] directed him to terminate—to go through with the termination process with [Plaintiff]." *Id.* tr. 134:1–6. HR director Mr. Currie testified that "the decision to terminate [Plaintiff] was in discussions between [Ms. Landeo] and our CEO, and who ultimately made the decision to do that." Dkt. 80-7 tr. 224:23–225:1. Joe Sullivan, BICSI's Chief Finance and Operations Officer, testified that he, Mr. Daniels, Mr. Currie, and BICSI's general counsel conferred just before Plaintiff's termination. Dkt. 79-14 tr. 47:22–48:12.

*Alleged Comparators and Disparate Treatment*

Plaintiff contends generally that Ms. Landeo treated her worse than others and that BICSI did not punish other employees who engaged in similar conduct as Plaintiff. As examples of Ms. Landeo treating Plaintiff more harshly, Plaintiff first points to Ms. Landeo's distaste for Plaintiff emailing and corresponding directly with other departments and Ms. Swaby, contrary to Ms. Landeo's directions to communicate through her. Dkt. 63-1 tr. 64:14–65:8. Plaintiff's coworker, Ms. Finne, apparently expressed that Ms. Landeo did not get as upset with her for doing this. *Id.* tr. 64:14–65:8. Plaintiff also recalls that Ms. Landeo implemented new design processes with only her, declining to also send "mood boards" and artwork inspirations to Ms. Finne. *Id.* tr. 100:21–25. Plaintiff testified generally to constant disagreement with Ms. Landeo, which she interprets as evidence of harassment based on her sexual orientation. *Id.* tr. 213:11–21.

As for employees who engaged in similar misconduct but were not punished, Plaintiff recalled a director named Jeff Silveira she once overheard yelling, cursing, and throwing things in his office. *Id.* tr. 57:9–58:11. BICSI did not discipline him for the outburst. Dkt. 80-7 tr. 242:13–243:6. Later, however, following a second outburst of profanities and desk pounding, BICSI terminated him. Dkt. 78 ¶ 17. One of Plaintiff's coworkers, Monica Campbell, also described another situation in which an employee became overly aggressive towards her, yelling and hitting the table, yet

BICSI did not discipline him. Dkt. 79-5 ¶ 11. Ms. Campbell also recalled another

employee unintentionally cursing in a video meeting. *Id.* ¶ 13. BICSI seemingly took

no formal action in response. *Id.*

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*,

93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact "might affect the

outcome of the suit under the governing law[.]" *Id.*

The moving party bears the initial burden of identifying those portions of the

record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the

nonmoving party to "come forward with specific facts showing that there is a

genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018)

(citation and internal quotation omitted). To satisfy its burden, the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). The nonmoving party must go beyond the pleadings and "identify

affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the nonmoving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the nonmoving party's favor. *Id.* Summary judgment should be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### *Appropriate Framework*

The Court begins by deciding under which framework to analyze Plaintiff's two claims: gender harassment and discrimination in violation of both Title VII and the Florida Civil Rights Act ("FCRA"). Dkt. 1 at 2, 8. BICSI's motion for summary judgment employs the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Dkt. 70 at 6. Under that framework, a litigant must show a *prima facie* case of discrimination, which an employer must rebut with legitimate business reasons for the employment decision. *McDonnell Douglas*, 411 U.S. at 802–03. The plaintiff then must show the offered reasons were pretext. *Id.* at 804. Plaintiff responds that this is the incorrect framework for this case. Dkt. 77 at

3. In mixed-motive cases, where both legitimate and illegitimate considerations motivate an employer, a plaintiff need only show that gender was *a* motivating factor in the adverse employment action. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241–42, 244 (1989).

The Court agrees with Plaintiff; this is a mixed-motive case to which *McDonnell Douglas* does not apply. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1237 (11th Cir. 2016). Plaintiff alleged that "BICSI subjected Plaintiff to a hostile working environment and took the above referenced adverse employment actions against Plaintiff, *at least in part*, because she does not conform to gender stereotypes for the female sex as a lesbian." Dkt. 1 ¶ 26 (emphasis added). The Court will thus proceed per Plaintiff's mixed-motive claims, determining whether she has submitted "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (emphasis in original) (citation and internal quotation omitted).

Of note, the mixed-motive analysis will proceed on the merits despite Defendant's initial use of the *McDonnell Douglas* framework in its motion. It was not unreasonable for BICSI to first use the *McDonnell Douglas* framework because, despite her complaint, Plaintiff has not admitted that any of BICSI's offered reasons for termination were legitimate. *See* Dkt. 78 ¶¶ 14, 17, 19, 24, 30, 34; *Subotic v.*

14

*Jabil, Inc.*, No. 8:21-CV-2137-VMC-SPF, 2022 WL 10487074, at *11 (M.D. Fla.

Oct. 18, 2022), *aff'd*, No. 22-13880, 2024 WL 797140 (11th Cir. Feb. 27, 2024).

Plus, Defendant had the chance to address Plaintiff's mixed-motive theory in its

reply, Dkt. 91 at 4–9, and district courts may consider new arguments raised in reply

briefs if they address issues raised for the first time in an opposing party's response.

*See, e.g.*, *Subotic*, 2022 WL 10487074, at *11. The Court addresses Plaintiff's claims

together as "[c]laims of discrimination under . . . the FCRA are analyzed in the same

manner as those brought under Title VII." *Austin v. Progressive RSC, Inc.*, 265 F.

App'x 836, 844 (11th Cir. 2008). Even under the more lenient mixed-motive

analysis, Plaintiff has failed to show a genuine issue of material fact regarding

discrimination.

### *Plaintiff's Proffered Evidence in Response to BICSI's Motion*

Responding to BICSI's motion that employed the *McDonnell Douglas*

framework, Plaintiff proffers a *prima facie* case and six arguments for why BICSI's

reasons for termination were pretext. Dkt. 77 at 6–12. Plaintiff then incorporates

these arguments into her mixed-motive analysis, as they serve generally as evidence

that BICSI took adverse action against Plaintiff because of her gender. *Id.* at 12. The

Court will address each in turn.

I.    ***Prima facie* case and comparators**

If Plaintiff were to demonstrate a *prima facie* case of discrimination, she must show that "(1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). An employee "similarly situated" to a plaintiff must be similarly situated in all material respects, such as having engaged in the same basic conduct, being subject to the same employment policies, being under the same supervisor, and sharing the same disciplinary history. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1227–28 (11th Cir. 2019). The *McDonnell Douglas* analysis, however, does not require a plaintiff to identify comparators; a "convincing mosaic" of other circumstantial evidence of discrimination also creates a triable issue of fact. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

As Plaintiff's proffer of both a *prima facie* case and general evidence that her gender was a motivating factor in her termination, Plaintiff explains how she was a woman, who worked at BICSI for eight years, was terminated, and was replaced by a male. Dkt 77 at 6 (citing *Wilson*, 376 F.3d at 1087). While this is technically a *prima facie* case, (1) Plaintiff is not proceeding under a *McDonnell Douglas* framework and, more importantly, (2) Plaintiff cannot show that BICSI's reasons

for termination were illegitimate or that gender was a motivating factor for her termination, as will be discussed at length for the remainder of this Order. *See, e.g.*, *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004) (finding a *prima facie* case where a male replaced a terminated female employee, but affirming the district court's grant of summary judgment for the employer because the employer's reasons for termination were not pretext).

Also of note, to the extent Plaintiff hints in her statement of facts that Mr. Silveira is a comparator, Dkt. 78 ¶ 17, he was not similarly situated to her and, moreover, BICSI also fired him. Mr. Silveira's first outburst was in his office rather than an all-staff, online meeting, so his conduct was not the same. Dkt. 63-1 tr. 57:9– 58:11; *see Lewis*, 918 F.3d at 1227. He was subject to BICSI policies, but he was a director while she was a designer who reported to different supervisors. *See Lewis*, 918 F.3d at 1227–28. There is also no indication he engaged in other misconduct similar to Plaintiff's, such as refusing to question job candidates and withholding information. And ultimately, BICSI terminated his employment after a second outburst involving profanities. Dkt. 78 ¶ 17. Mr. Silveira is thus not a similarly situated employee who BICSI treated more favorably. *See Lewis*, 918 F.3d at 1227– 28.

The coworkers Ms. Campbell recalled misbehaving also are not comparators. As for the man who behaved aggressively at work, Dkt. 79-5 ¶ 11, Plaintiff is not

alleged to have engaged in any similar physical conduct. And as for the man who accidentally cursed at the beginning of a video meeting without formal consequence, *id.* ¶ 13, BICSI also did not formally discipline Plaintiff when she did the same thing. Both Plaintiff's supervisors and the other employee's supervisor, who were seemingly not the same people, communicated informally with Plaintiff and the other employee after the incidents occurred. Dkts. 79-5 ¶ 13; 69 ¶ 16; 78 ¶ 14. Plaintiff cannot point to similarly situated employees that BICSI treated more favorably. *See Lewis*, 918 F.3d at 1227–28.

## II.    Failure to specify reason for termination

The next evidence of gender discrimination Plaintiff tenders is BICSI's failure to specify a reason at the time of Plaintiff's termination beyond her "violating the code of conduct." Dkt. 77 at 8. Plaintiff cites to *Mock v. Bell Helicopter Textron, Inc.*, wherein the Eleventh Circuit vacated summary judgment entered for the defendant. 196 F. App'x 773, 774 (11th Cir. 2006). There, the employer refused to give a reason when it fired the plaintiff. *Id.* Only later did the employer mail a letter stating it terminated the plaintiff for "unacceptable performance." *Id.* "In light of [the employer's] refusal to tell [the plaintiff]—at the time it fired him—why his employment had come to an end, a trier of fact reasonably could find that the letter constituted a pretext for discrimination." *Id.*

Here, though, BICSI did give Plaintiff the reason for its decision at the time of her termination. While perhaps not the model of clarity, "violating the code of conduct" is still a reason; plus, it is a reason equally as clear as "unacceptable performance." *See id.*; *Stewart v. Bryant*, No. 1:21-CV-11 (LAG), 2022 WL 22889184, at *10 (M.D. Ga. Sept. 13, 2022) (finding the defendant's given reason for termination, "violation of Code of Conduct Policy 5.0," was not pretext because it encompassed all the proffered reasons for termination). "Violating the code of conduct" includes withholding branding information, which was the ultimate reason for Plaintiff's termination. *See Stewart*, 2022 WL 22889184, at *10. BICSI's "failure to state a reason" is not supported by either the record or *Mock*, and it is not tenable evidence of gender discrimination.

### III.    Shifting explanations for termination

Plaintiff's next proffered evidence of discrimination is BICSI's alleged shifting explanations for terminating her, Dkt. 77 at 8–9 (citing, *e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)), although the Court is not convinced the evidence conflicts. Plaintiff begins by reiterating that BICSI first shared a specific reason for her termination months after it occurred. Dkt. 77 at 9. She additionally asserts that "BICSI's witnesses have repeatedly claimed" that Plaintiff was terminated for cursing at the all-staff meeting, despite BICSI's corporate representative testifying to the opposite. *Id.* She finally points to Ms.

Landeo's documentation of Plaintiff's misconduct, sent to HR after her termination, as fodder for BICSI to broaden its reasons for termination. *Id.*

The evidence, however, paints a cohesive picture of Plaintiff's termination. First, and as discussed above, BICSI stating it was terminating Plaintiff for "violating the code of conduct" is not inconsistent with anything. Dkt. 63-1 tr. 109:15–22. "Violating the code of conduct" would include withholding branding information, which was the ultimate reason for Plaintiff's termination. *See Stewart*, 2022 WL 22889184, at *10.

Second, BICSI's "witnesses" have not "repeatedly claimed" Plaintiff was ultimately terminated for cursing during the all-staff meeting. Only CEO Mr. Daniels testified that "*in [his] mind* . . . when [he] made the decision to terminate her, it was in consideration of all of these things that ha[d] led up to that point . . . that had been disruptive and, in [his] opinion, insubordinate over a period of time."[1] Dkt. 80-4 tr. 135:11–136:4 (emphasis added). But he decided termination was warranted only after learning from Ms. Landeo that Plaintiff withheld BICSI's policy on red, which was exactly the conversation he had with other company leaders agreeing to the termination. Dkt. 79-14 tr. 54:8–12 ("Q. Was there any other reason that was given for terminating Stacy Frank other than withholding that information?

---

[1] The incidents include cursing during the all-staff meeting, Plaintiff's "attitude towards the training, [BICSI's] new hires, her attitude toward the interview process, [and] her derogatory comments toward the leadership of the organization." Dkt. 80-4 tr. 135:11–24.

A. That was the discussion that we had that specific morning."); Dkt. 80-6 (BICSI

corporate representative depo.) tr. 107:17–22 ("[The cursing incident] didn't serve

[as] any basis regarding her termination."). To Mr. Daniels, the cursing incident was

one piece in a pattern of misconduct that culminated in Plaintiff withholding BICSI's

policy on red, which was the ultimate reason for Mr. Daniels deciding and others

agreeing to terminate Plaintiff.

Finally, as for Ms. Landeo's list allegedly broadening BICSI's reasons for

Plaintiff's termination after-the-fact, the evidence is to the contrary. CEO Mr.

Daniels testified to discussing those instances of misconduct with Ms. Landeo as

they happened. Dkt. 80-4 tr. 129:18–130:13. They thus existed "in his mind" as he

decided the red-policy incident was the final straw. *Id.* tr. 135:11–136:4. In short,

BICSI has not given shifting and conflicting explanations for Plaintiff's termination

that might serve as evidence of discrimination.

## IV.   Plaintiff's prior performance

Plaintiff cites her past successful performance, under her prior "long-term

supervisor and manager," as evidence that BICSI's stated reasons for termination

are manufactured to hide discrimination. Dkt. 77 at 10. She notes that BICSI never

formally disciplined her for anything, and that she received positive performance

reviews for nearly all of her eight years at BICSI. *Id.*

Plaintiff, however, did not have the same experience under Ms. Landeo, and "[d]ifferent supervisors may impose different standards of behavior." *Rojas v. Fla.*, 285 F.3d 1339, 1343 (11th Cir. 2002) (finding that a prior supervisor's testimony that the plaintiff was "one of the best" employees she ever had did not create a genuine issue on pretext and affirming summary judgment for the employer). The incidents Ms. Landeo noted—*e.g.*, cursing during the all-staff meeting, refusing to question job candidates, doubting the "credibility" and competence of BICSI leaders, withholding BICSI's non-use of red—happened. Plaintiff often seeks to explain why or how the incidents transpired, but she does not dispute that they happened. Dkt. 63-1 tr. 56:12–14; *id.* tr. 152:25–153:1; *id.* tr. 153:2–154:1; *id.* tr. 99:12–15; *see also* Dkt. 80-6 (BICSI corporate representative depo.) tr. 22:11–18 ("The majority of her employment up until those final—over the last year or so of her employment, yes, I would agree [her performance was good]."). Ms. Landeo was within her rights as Plaintiff's supervisor to discuss those undisputed conflicts with Mr. Daniels, and the Court cannot decide whether that was "wise or nice or accurate." *Rojas*, 285 F.3d at 1344. The Court is concerned with whether discriminatory animus motivated Plaintiff's termination, *id.* at 1342, and thus far there has been no indication of that.

## V.     Progressive discipline policy

Plaintiff next points to BICSI's failure to follow its progressive discipline policy as evidence of discrimination. Dkt. 77 at 10 (citing, *e.g.*, *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 892 (11th Cir. 2016)). In *Chavez*, the discipline policy explicitly explained "[p]rogressive discipline means that, with respect to most disciplinary problems, these steps will normally be followed." 641 F. App'x at 892 (internal quotation omitted). It also listed employee behaviors that "may result in immediate discharge," and the reason given for the plaintiff's termination was not included. *Id.* (internal quotation omitted).

Conversely, BICSI's progressive discipline policy is discretionary, and the failure to follow it is not evidence of discrimination. *E.g.*, *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 873 (11th Cir. 2011) ("[I]f management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext."). BICSI's policy states: "Disciplinary action is at the discretion of BICSI and may include, but is not limited to verbal warning, written warning, and separation. There is no guarantee that one form of disciplinary action will necessarily precede another." Dkt. 63-7 at 2. As such, BICSI's choice to terminate Plaintiff was not contrary to a mandatory progression, and accordingly does not evidence discrimination.

Notably, while BICSI had followed its progressive discipline policy at times, it also previously had exercised its discretion to terminate an employee without notice. Dkt. 78 ¶ 47. This previous deviation from the policy counsels against interpreting Plaintiff's termination as evidence of discrimination. *Ritchie*, 426 F. App'x at 874 ("[T]he company's failure to conform to the policy in [the plaintiff's] case does not establish pretext" because "the policy was not followed in every case.").

It is lastly worth emphasizing that Mr. Daniels decided to terminate Plaintiff after cumulative misconduct, discussed with Ms. Landeo in "conversations" over time. Dkt. 80-4 tr. 130:7–13; *id.* tr. 135:11–136:4; *see also* Dkt. 80-6 (BICSI corporate representative depo.) tr. 112:7–21 ("[T]o say that every conversation of counseling or mentoring is in a personnel file is a little bit of a stretch."). In short, BICSI's deviation from its formal progressive discipline policy is not evidence of discrimination.

## VI.    Ms. Landeo's conduct

Plaintiff next summarily asserts that Ms. Landeo "repeatedly violated the Code of Conduct without consequence, [Dkt. 78 ¶¶] 20, 22, 40, 49, 63, which also demonstrates pretext." Dkt. 77 at 11 (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1366 (11th Cir. 1999)). But, simply, the Court does not know whether Ms. Landeo's behavior violated BICSI's code of conduct or warranted

24

discipline, and it is not for the Court to decide. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[Courts] do not sit as a 'super-personnel department.'" (citation omitted)).

Moreover, in *Damon*, the court decided a jury could find pretext where a manager engaged in the same specific conduct identified as the reason for the employee's termination, namely yelling at other employees on the salesfloor in front of customers. 196 F.3d at 1365–66. Here, Plaintiff does not suggest that Ms. Landeo engaged, unscathed, in the same specific conduct as Plaintiff. Plaintiff suggests that other behavior of Ms. Landeo violated the code of conduct, but it is not appropriate for the Court to decide that or view BICSI's indecision as discrimination. *See Alvarez*, 610 F.3d at 1266.

## VII.   Conflicting testimony as to who decided to terminate Plaintiff

Plaintiff argues that BICSI's testimony varies as to who decided to terminate Plaintiff, although, as discussed above in the factual background, the Court does not view the testimony as inconsistent. In sum, Ms. Landeo went to Mr. Daniels about the red-policy incident, Mr. Daniels decided termination was warranted, and Mr. Daniels convened a meeting with other BICSI leaders to affirm the decision. *Supra* at 10.

Plaintiff continues that "[w]hatever version is true, the evidence is clear BICSI's stated reasons for terminating [Plaintiff] are based entirely upon [Ms.]

Landeo's false accusations." Dkt. 77 at 11. Yet Plaintiff has admitted to many of the instances of misconduct, albeit not characterizing them as such. Dkt. 63-1 tr. 56:12–14 (cursing during the all-staff meeting); *id.* tr. 152:25–153:1 (refusing to question job candidates); *id.* tr. 153:2–154:1 (doubting the competence of BICSI leaders); *id.* tr. 99:12–15 (withholding BICSI's non-use of red).

Finally, to the extent Plaintiff suggests that Ms. Landeo's memo to HR is evidence that she requested Plaintiff's termination, this is impossible per Plaintiff's own version of events. As Plaintiff insists, Ms. Landeo sent the memo to HR after BICSI terminated Plaintiff. Dkt. 78 ¶ 69. Ms. Landeo's statement in the memo that she "feel[s] it's appropriate to take the next steps in addressing [her] concerns," Dkt. 81-12, is thus both vague and subsequent to Plaintiff's dismissal. In sum, the evidence as to who decided to terminate Plaintiff is not conflicting.

*Plaintiff's Additional Evidence*

Plaintiff's response, Dkt. 77 at 12–17, offers additional evidence of discriminatory intent to survive summary judgment under the mixed-motive analysis, which, again, requires only that her gender "was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (emphasis in original) (citation and internal quotation omitted).

## I.    *Price Waterhouse*

Plaintiff begins by excerpting *Price Waterhouse v. Hopkins* to support the proposition that BICSI terminated Plaintiff because she does not conform to gender stereotypes. 490 U.S. 228. In *Price Waterhouse*, a woman was not admitted to a partnership despite years of excellent work. *Id.* at 233–34. Price Waterhouse claimed it forwent her partnership because of her aggressive personality. *Id.* at 234. There also, however, was evidence of gender stereotyping contributing to the decision, which the court described as follows:

> There were clear signs, though, that some of the partners reacted negatively to Hopkins' personality because she was a woman. One partner described her as "macho" (Defendant's Exh. 30); another suggested that she "overcompensated for being a woman" (Defendant's Exh. 31); a third advised her to take "a course at charm school" (Defendant's Exh. 27). Several partners criticized her use of profanity; in response, one partner suggested that those partners objected to her swearing only "because it's a lady using foul language." Tr. 321. Another supporter explained that Hopkins "ha[d] matured from a tough-talking somewhat masculine hard-nosed mgr to an authoritative, formidable, but much more appealing lady ptr candidate." Defendant's Exh. 27. But it was the man who, as Judge Gesell found, bore responsibility for explaining to Hopkins the reasons for the Policy Board's decision to place her candidacy on hold who delivered the *coup de grace*: in order to improve her chances for partnership, Thomas Beyer advised, Hopkins should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 618 F.Supp., at 1117.

*Id.* at 235. Ultimately, the Court explained that when legitimate reasons (Ms. Hopkins was too aggressive) and illegitimate reasons (Ms. Hopkins was too aggressive *for a woman*) motivate an employer's action, the employer may avoid

27

liability only by showing it would have made the same decision without considering the plaintiff's gender. *Id.* at 258.

Unlike *Price Waterhouse*, the comments Plaintiff cites as evidence of gender stereotyping describe her only as "outspoken," not as "outspoken *for a woman*." Dkt. 80-1 (Ms. Landeo depo.) tr. 102:9–13; *see also* Dkt. 80-7 (BICSI corporate representative depo.) tr. 218:4–9 ("There have been times that I've heard [Plaintiff] come across what some might consider a little harsh, a little strong, not everybody can—can take very strong personalities. She's got a very strong opinion on the things that she has an opinion of."). The *Price Waterhouse* comments were blatantly riddled with gender stereotyping: Ms. Hopkins was "macho," "overcompensat[ing] for being a woman," and "a lady using foul language." 490 U.S. at 235. Here, Plaintiff was simply "harsh," "outspoken," and using foul language. As *Price Waterhouse* noted, "interpersonal problems" can be a legitimate reason for an adverse employment action. *Id.* at 252. The comments Plaintiff presents as evidence do not support that BICSI illegitimately considered her gender.

## II.    *Bostock*

Plaintiff also argues that Ms. Landeo "harbored animus toward [Plaintiff's] homosexuality," and termination based on sexual orientation is necessarily gender stereotyping and therefore gender discrimination. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 662 (2020) ("For an employer to discriminate against employees for being

homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms.").

The record, however, is devoid of evidence that Ms. Landeo harbored animus toward Plaintiff's sexuality, save for one stray comment unrelated to Plaintiff's termination. Comments unassociated with an adverse employment action are regularly discarded as insufficient to evidence discrimination. *E.g.*, *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1322 n.10, 1323 (11th Cir. 1998) (finding supervisor's previous comments that "You black girls make me sick" were "not enough to establish a prima facie case" because "they were not associated with the events of the day leading to [the plaintiff's] discharge"); *Addison v. Ingles Mkts., Inc.*, 515 F. App'x 840, 843 (11th Cir. 2013) ("None of the manager's allegedly racist comments were related to [the plaintiff's] firing in any substantive way. . . . Therefore, the fact of these comments, in and of themselves, does not suffice to establish that racial animus was more likely the motivator of [the plaintiff's] termination than her violation of [the employer's] policy."). In March 2023, while sharing the baked goods Plaintiff's partner made, Ms. Landeo called her either "that person [Plaintiff] lives with," Dkt. 84-13 at 7, or "[Plaintiff's] roommate." Dkt. 79-5 ¶ 10. Because this comment was entirely unrelated to Plaintiff's termination months later, it cannot serve as evidence that BICSI terminated Plaintiff because of

her sexuality. *E.g.*, *Jones*, 151 F.3d at 1322 n.10, 1323; *Addison*, 515 F. App'x at 843.

Notably, Plaintiff also argues that Ms. Landeo's "differential treatment" of her was because of discriminatory animus, although record evidence reflects otherwise. Even if an employee is singled out, "[u]nless something links the actions to the employee's [gender], that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on [gender]." *Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013). In Plaintiff's coworker's complaint to HR, she noted how Ms. Landeo spoke about Plaintiff: "[Ms. Landeo] has told me that [Plaintiff] has a 'difficult personality' and . . . she feels that [Plaintiff] should be spoken to in a certain way." Dkt. 84-11 at 3. Moreover, when asked at her deposition if it was possible Ms. Landeo treated her differently because of cursing at the all-staff meeting, continuing to copy Ms. Swaby on emails Ms. Landeo wanted private, refusing to participate in the interview process, and expressing frustration at how the marketing department was hiring, Plaintiff responded: "I don't know." Dkt. 63-1 tr. 215:21–216:20. While there is evidence that Ms. Landeo treated Plaintiff differently because of her "difficult personality," there is no evidence that Ms. Landeo treated Plaintiff differently because of her sexuality.

### III.    Events designer position

Plaintiff argues that BICSI placing Ms. Finne in the new events designer position is evidence of BICSI treating Plaintiff worse than gender conforming females. Dkt. 77 at 15. Above, the Court explained Mr. Daniels' testimony on the new designer position. In sum, BICSI was reorganizing the marketing department to create more specific positions, and opted to repurpose Ms. Finne's role to an events designer while retaining Plaintiff as a senior graphic designer. *Supra* at 5–6.

Plaintiff is hard-pressed to argue that this is evidence of discrimination. Plaintiff was already in a superior position to Ms. Finne at the time of the reorganization, working as a senior graphic designer rather than a graphic designer. Dkt. 80-4 tr. 120:1–2; *id.* tr. 121:24–25. The new events designer position was only a "promotion" for Ms. Finne because BICSI paid her less than Plaintiff. *Id.* tr. 121:12–19. The reorganization brought her to the same pay grade as Plaintiff. *Id.* tr. 121:12–19. Indeed, Plaintiff speculated the new position would have been a "lateral" transition to her rather than a promotion with a pay raise. Dkt. 63-1 tr. 46:19–23. And as for a change in Plaintiff's responsibilities, Mr. Daniels testified that the small size of the team meant everyone would still be supporting all projects, especially for the transition period. Dkt. 80-4 tr. 121:1–8. Plus, BICSI still needed a senior graphic designer to oversee the other specific product lines. *Id.* tr. 121:24–122:2. In short, BICSI sought to reorganize the marketing department, and there is no reason to view

the arrangement as evidence of discriminatory animus. *See Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 836 (11th Cir. 2015) (explaining the denial of a lateral transfer is not usually an adverse employment action if the plaintiff did not suffer a reduction in "pay, prestige, or responsibility by remaining in the same position").

### IV.   Ms. Landeo's poor treatment of others and BICSI's response

Plaintiff asserts that Ms. Landeo's general behavior, and BICSI's response to it, both show discriminatory intent. Dkt. 77 at 15–16. As evidence that Ms. Landeo preferred traditional gender norms, Plaintiff explains a specific instance where Ms. Landeo told another employee that she needed "to believe in God and save herself for marriage." *Id.* at 15. Plaintiff also states that based on employees' complaints about Ms. Landeo, BICSI conducted a review of the marketing department. *Id.* at 16. That investigation "confirmed that [Ms.] Landeo lacked integrity, was dishonest, disrespectful, and unprofessional," yet BICSI promoted and trained Ms. Landeo rather than disciplining her. *Id.*

First, the comment to another employee about believing in God and saving herself for marriage had nothing to do with Plaintiff's termination, and, moreover, nothing to do with Plaintiff. It is thus not evidence that Plaintiff's termination was gender motivated. *See, e.g., Addison*, 515 F. App'x at 843.

32

Second, that Ms. Landeo "lacked integrity, was dishonest, disrespectful, and unprofessional" evokes the Vince Lombardi rule more than discrimination. *Alvarez*, 610 F.3d at 1267 ("This is a classic example of the Vince Lombardi rule: someone who treats everyone badly is not guilty of discriminating against anyone."); *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007) ("It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct."). Indeed, Plaintiff's coworkers also complained of either the same conduct Plaintiff did, or conduct that did not occur to Plaintiff but that she now cites as evidence of gender stereotyping: Ms. Landeo directing the marketing department staff not to speak directly with Ms. Swaby or other outside employees, representing untruthful updates to BICSI officers, speaking about others behind their backs, ignoring ongoing meetings, and forcing personal conversations about intimacy, religion, and health information. Dkts. 84-8 at 1; 84-11 at 2–4. Plaintiff's own complaint to HR explained that her grievance was not with changes in the department, but "more so about how [she], *along with [her] peers*, ha[d] been treated." Dkt. 81-3 at 1 (emphasis added). Ms. Landeo's conduct seems to have been indiscriminate, which does not support Plaintiff's claims of discrimination. *See Alvarez*, 610 F.3d at 1267.

Finally, and as mentioned above, it is not the Court's role to second-guess how BICSI chose to proceed with either disciplining or training Ms. Landeo. *See id.*

33

at 1266. Absent evidence of discriminatory motive, BICSI's business decisions are
its own.

### V.    Mr. Daniels' discriminatory intent

Plaintiff argues there is also evidence that CEO Mr. Daniels discriminated
against women at BICSI, particularly "outspoken" women in leadership. Dkt. 77 at
16. She cites to instances regarding her former supervisor, the former president of
BICSI's board of directors, and Ms. Swaby, and argues that they further support
BICSI terminated her because of her gender. *Id.* at 16–17.

Plaintiff's assertion, however, is far too speculative to serve as evidence of
gender discrimination against her. *See Patterson v. AJ Servs. Joint Venture I, LLP*,
No. CV 115-138, 2017 WL 830394, at *8 (S.D. Ga. Mar. 2, 2017) (finding the
plaintiff did not create a genuine issue of material fact in her FMLA retaliation claim
when she identified six other women fired for taking FMLA leave because "to reach
the conclusion that these other individuals were fired . . . because they were women
who took FMLA leave, . . . and thus to draw an inference of discriminatory intent
from Plaintiff's own termination based on this evidence, would require unwarranted
speculation" (cleaned up)); *see also, e.g.*, *Jones*, 151 F.3d at 1322 n.10, 1323
(explaining that comments unassociated with the adverse employment action are
insufficient to evidence discrimination); *Addison*, 515 F. App'x at 843 (same). Any
comments Mr. Daniels made or actions he took regarding these other women that

arguably showed discriminatory animus are unrelated to Plaintiff or her termination.

Plaintiff has not produced evidence that discriminatory animus actually factored into

Mr. Daniels' decision to terminate her. *See Patterson*, 2017 WL 830394, at *8.

### *Plaintiff's Harassment/Hostile Work Environment Allegations*

As part of Plaintiff's two claims, she also alleges that "BICSI subjected [her]

to a hostile working environment and took the above referenced adverse

employment actions against [her]" at least partly because she does not conform to

gender stereotypes. Dkt. 1 ¶¶ 26, 31.

BICSI argues in its motion that to prove a hostile work environment claim, a

plaintiff must show: "(1) that she belongs to a protected group; (2) that she has been

subject to unwelcome harassment; (3) that the harassment was based on a protected

characteristic; (4) that the harassment was sufficiently severe or pervasive to alter

terms and conditions of employment and create a discriminatorily abusive working

environment; and (5) that the employer is responsible for such environment under

either a theory of vicarious or of direct liability." Dkt. 70 at 15 (citing *Mendoza v.*

*Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)). Plaintiff responds that she need

not prove a case of gender harassment by showing pervasive harassment; she can

also show "a supervisor's harassment based upon a protected category culminating

in a tangible employment action." Dkt. 77 at 18 (citing *Hulsey v. Pride Restaurants,*

*LLC*, 367 F.3d 1238, 1244–45, 1247 (11th Cir. 2004)). As evidence of gender harassment, Plaintiff cites Ms. Landeo "removing her duties, denying her the opportunity to apply for a new position, [] terminating her a month later, . . . disparaging [Plaintiff] and her partner, yelling at her in front of others, making multiple false accusations against her, and interfering with [Plaintiff's] ability to perform her job." Dkt. 77 at 18.

First, some of Plaintiff's proffered evidence of harassment by Ms. Landeo is not supported by the record. Plaintiff now states that Ms. Landeo was responsible for the new events designer position and the marketing department reorganization, yet Mr. Daniels testified that "[he] made the final decision to promote [Plaintiff's coworker] into that position," and that "[t]he final decision for the organizational structure was [his]." Dkt. 80-4 tr. 123:7–8; *id.* tr. 122:18–20. He also testified that he made the decision to terminate Plaintiff. *Id.* tr. 135:25. There is no evidence to the contrary. Plaintiff cannot characterize these events as harassment by Ms. Landeo. *See Pierri v. Cingular Wireless, LLC*, 397 F. Supp. 2d 1364, 1376 (N.D. Ga. 2005) (finding the plaintiff could not show she was subject to harassment by citing conduct for which her alleged harasser was not responsible).

Next, under either analysis, Plaintiff must show harassment based on a protected characteristic, which, as discussed at length above, Plaintiff cannot do. *See, e.g.*, *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583–84 (11th Cir. 2000)

36

(excluding non-gender related statements and conduct from hostile environment claim analysis); *Troupe v. DeJoy*, 861 F. App'x 291, 295 (11th Cir. 2021) (affirming summary judgment for the employer on the plaintiff's hostile work environment claim because she "ha[d] not shown that the alleged mistreatment she suffered was in any way motivated by her race or color"). To the extent "disparaging [Plaintiff] and her partner" refers to Ms. Landeo once calling Plaintiff's partner her roommate, one gender-related comment is wholly insufficient to support a claim of harassment. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (citation and internal quotation omitted)).

Plaintiff's remaining evidence is unrelated to gender. Plaintiff has not shown that Ms. Landeo "yelling at her in front of others, making multiple false accusations against her, and interfering with [her] ability to perform her job" was motivated by Plaintiff's gender. *See Troupe*, 861 F. App'x at 295 (finding the plaintiff failed to show that her supervisor "questioning her work ethic in front of other employees [and] treating her with a cold or sarcastic demeanor" was motivated by the plaintiff's protected characteristic). Specifically regarding Ms. Landeo "making multiple false accusations against [Plaintiff]," (1) Plaintiff admitted to many of the incidents Ms. Landeo reported, and (2) other employees complained of Ms. Landeo being

37

dishonest to BICSI leaders. Dkt. 63-1 tr. 56:12–14; *id.* tr. 152:25–153:1; *id.* tr. 153:2–154:1; *id.* tr. 99:12–15; Dkt. 84-11 (Ms. Lamadrid's complaint to HR) at 2, 3. Other employees also complained of Ms. Landeo interfering with their work productivity or ability to communicate outside the marketing department. Dkt. 84-11 at 2; *see Alvarez*, 610 F.3d at 1267 ("[S]omeone who treats everyone badly is not guilty of discriminating against anyone."). In sum, as discussed throughout this Order, Plaintiff cannot show that any alleged harassment or hostile work environment she experienced was based on her gender or gender nonconformity. As such, BICSI's motion for summary judgment is due to be granted.

## *Moot Issues*

### I.    Cat's paw

Plaintiff argues that Ms. Landeo's discriminatory intent can be imputed to Mr. Daniels under a cat's paw theory because no one investigated her reports of Plaintiff's misconduct before deciding to terminate her. Dkt. 77 at 12 (citing *Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (explaining that "even when the harasser in a Title VII case is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker as her 'cat's paw'—i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation . . . —causation is established"

(citation omitted)). Because Plaintiff has not shown that discriminatory intent motivated BICSI's decision to terminate her, the Court need not conduct a cat's paw analysis into whether discriminatory intent can be imputed to Mr. Daniels.

## II.    After-acquired evidence doctrine

BICSI argues in its motion that Plaintiff's damages should be limited because "[a]n employer may rely on so-called 'after-acquired evidence' of an employee's misconduct, or other facts learned after a termination, to suggest that the employee would have been terminated anyway at some point even if he or she [had] not been subject to the alleged discrimination." Dkt. 70 at 24 (citing *Wallace v. Dunn Const. Co.*, 62 F.3d 374, 378 (11th Cir. 1995)). BICSI argues that Plaintiff engaged in outside employment while working for BICSI in violation of the employee handbook, and that BICSI would have terminated her anyway had it known that. But because Plaintiff has not shown that gender was a motivating factor in BICSI's termination decision, the Court need not decide whether after-acquired evidence would have reduced or eliminated Plaintiff's claims.

## CONCLUSION

Plaintiff has not shown that either her gender or gender nonconformity was a motivating factor in BICSI's termination decision. Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Defendant's motion for summary judgment, Dkt. 70, is **GRANTED**.

(2) The Clerk is directed to enter final judgment in favor of Defendant.

(3) The Clerk is directed to terminate any pending motions and deadlines,

and to close the case.

**DONE AND ORDERED** in Tampa, Florida, on May 30, 2025.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record